IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|                                    |     |                             |
|------------------------------------|-----|-----------------------------|
| HOLLEY F. WHITFIELD, et al.        | :   |                             |
|                                    | :   |                             |
| v.                                 | :   | Civil Action No. DKC 12-2749 |
|                                    | :   |                             |
| SOUTHERN MARYLAND HOSPITAL, INC., et al. | :   |                             |

**MEMORANDUM OPINION**

Presently pending and ready for review in this medical malpractice case are four motions: (1) a motion *in limine* under *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), to strike and exclude causation testimony by David H. Goldstein, M.D. filed by Defendants Southern Maryland Hospital, Inc.; Weatherby Locums, Inc.; Edna Ruth Hill, M.D.; Gastrointestinal Associates of Maryland, P.A.; and Lornette Mills, M.D. ("Defendants") (ECF No. 49); (2) a motion for summary judgment filed by Defendants (ECF No. 50); (3) a separate motion for summary judgment filed by Defendant Weatherby Locums, Inc. (ECF No. 44); and (4) a motion filed by Defendants to withdraw certain exhibits that contain personal identifying information and replace those exhibits with redacted versions (ECF No. 56). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to exclude Dr. Goldstein's

testimony will be denied.  Defendants' motion for summary judgment will be denied.  Defendant Weatherby Locums, Inc.'s motion for summary judgment will be granted.  Defendants' motion to withdraw and replace certain exhibits will be granted.

## I.  Factual Background[1]

### A.  Pre-Complaint

On September 28, 2008, Plaintiff Holley Whitfield went to the emergency department at Southern Maryland Hospital ("SMH"), complaining of abdominal pain and vomiting blood.  Ms. Whitfield was seen by Defendant Dr. Edna Ruth Hill – an employee of SMH and Weatherby Locums[2] – who noted that Ms. Whitfield characterized her abdominal pain as high as nine out of ten. Dr. Hill noted that Plaintiff was suffering from nausea and frequent bloody vomiting, had irregular lab results, and was on birth control pills.  (ECF No. 1 ¶¶ 25-28).  Dr. Hill reviewed an X-ray taken of Plaintiff and arrived at an initial diagnosis of upper gastrointestinal bleeding.  Dr. Hill did not order a computerized tomography scan ("CAT Scan").  (*Id.* ¶¶ 31, 33).

_____

[1] Unless otherwise noted, the facts outlined here are construed in the light most favorable to Plaintiff, the nonmoving party.

[2] Plaintiff states that "[u]pon information and belief, Defendant Weatherby [Locums, Inc.] was contractually obligated to provide emergency room physicians to staff Defendant SMH's emergency room."  (ECF No. 1 ¶ 20).  Weatherby contests Plaintiff's assertion that Dr. Hill is its employee in the motion for summary judgment.

Dr. Hill consulted with SMH hospitalist Shannon Asko, who was aware of Plaintiff's complaints of extreme pain.

Plaintiff was subsequently admitted to SMH in the early morning hours of September 29, 2008, under the care of SMH Doctor Rasheed Abassi. (*Id.* ¶¶ 34, 36-37). Dr. Abassi was aware of Plaintiff's acute pain. (*Id.* ¶ 38). At 1:15 P.M. on September 29, 2008, Defendant Dr. Lornette Mills, a gastroenterologist employed by Gastrointestinal Associates of Maryland ("GAM"), first saw and treated Plaintiff.[3] She noted a differential diagnosis of "1. NSAID gastropathy/peptic ulcer disease. 2. Mallory-Weiss tear. 3. Ateriovenous [sic] malformation. 4. Small bowel lesion." (*Id.* ¶ 41). That same afternoon, Mills conducted an endoscopy on Plaintiff and noted "upper gastrointestinal bleeding with the source likely beyond the second portion of the duodenum." (*Id.* ¶ 42). She updated her differential diagnosis to: "1. Meckel diverticulum. 2. Arteriovenous malformation. 3. Small bowel lesion." (*Id.*). Mills recommended a Meckel scan which indicated "no abnormality is seen to suggest a Meckel's diverticulum." (*Id.* ¶ 43). Two days later, on October 1, 2008, Plaintiff underwent a computerized tomography angiography scan ("CTA Scan") on her chest which indicated a small left pleural effusion.

---

[3] Plaintiff alleges that GAM had an agreement with SMH to provide gastrointestinal consultations for SMH. (ECF No. 1 ¶ 24).

Plaintiff's vital statistics were continually irregular and unstable, and she continued to lose blood. (*Id.* ¶ 44). SMH Doctor George Okang was consulted, who determined that Plaintiff was to be admitted to the intensive care unit because of her persistently high heart rate. (*Id.* ¶ 45).

On October 2, 2008, Dr. Okang ordered a CAT Scan due to Plaintiff's persistent abdomen pain. Most relevant for this case, the CAT Scan revealed a superior mesenteric vein thrombosis ("SMVT"). SMVT is a clot of the superior mesenteric vein through which blood leaves the intestine. SMVT, if left untreated, can eventually cause death. Defendants did not administer any anticoagulation medicine. Plaintiffs contend that they did not act with any speed despite the seriousness of Ms. Whitfield's diagnosis. (*Id.* ¶¶ 47-49).

Ms. Whitfield's family was informed of her diagnosis and requested a transfer to the Medical College of Virginia ("MCV") in Richmond, Virginia, a facility that was better equipped to handle SMVT. SMH refused to transfer her unless and until a physician from an accepting hospital notified SMH that it would accept Plaintiff. Plaintiff's family worked the phones until they found a physician who arranged the transfer on October 3, 2008. (*Id.* ¶¶ 50-53).

Upon arrival at MCV, Plaintiff was diagnosed with acute mesenteric ischemia, or internal bleeding of the mesenteric

vein. Plaintiff underwent surgery which resulted in the removal
of seventeen inches of her small intestine after it had died
from lack of blood. (*Id.* ¶¶ 54-55). During her time at SMH and
MCV, Plaintiff suffered additional consequences from her acute
mesenteric ischemia, including "persistently low hemoglobin
levels, rectal bleeding, confusion, agitation, altered mental
status requiring medication and psychological consultations,
high blood sugar, nausea and vomiting, high pulse rate, rapid
shivering and twitching of her jaw, incontinence, inability to
talk and/or respond to questions, hospital acquired MRSA
[Methicillin-resistant Staphylococcus Aureus], [and] explosive
diarrhea." (*Id.* ¶ 60). "Plaintiff continues to experience
significant and severe physical and mental anguish, pain,
suffering, inconvenience, physical impairment, disfigurement,
and other injuries, as well as additional medical treatment,
bills, and loss of earnings and economic capacity." (*Id.* ¶ 63).

**B. Complaint**

Plaintiffs allege that Defendants provided inadequate care
and treatment to Ms. Whitfield from September 29 to October 3,
2008.

The Maryland Health Care Malpractice Claims Act (the
"Malpractice Claims Act"), Md. Code Ann., Cts. & Jud. Proc. §§
3-2A-01 *et seq.*, governs the procedures for medical malpractice
claims in the state of Maryland. *See, e.g., Carroll v. Kontis*,

400 Md. 167, 172 (2007).   On September 26, 2011, Plaintiffs filed a Statement of Claim in the Healthcare Alternative Dispute Resolution Office ("HCADRO"). The HCADRO is an administrative body established by the Malpractice Claims Act.

A party can waive arbitration in the HCADRO, which terminates proceedings. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-06B(a) to (d)(1).   The Malpractice Claims Act notes that suit may then be filed in either Maryland Circuit Court or the U.S. District Court. *Id.* §§ 3-2A-06A(c), 06B(f).

On July 24, 2012, all Defendants filed an election to waive arbitration under the Malpractice Claims Act.   On July 27, 2012, HCADRO ordered transfer to this court.   Plaintiffs filed their complaint on September 14, 2012.   (ECF No. 1).[4]   Plaintiffs complaint consists of two claims: first, a claim of medical negligence; specifically, that Defendants owed Plaintiff Holley Whitfield a duty to exercise that degree of skill and care ordinarily possessed and used by health care providers acting in the same or similar circumstances.   Plaintiffs allege that Defendants breached this duty in a variety of ways, the result of which directly and proximately caused Plaintiff's economic and non-economic damages.   Second, Plaintiffs claim that as a direct and proximate cause of Defendants' negligence, Plaintiffs

---

[4]   The other Plaintiff is Michael Whitfield, Holley Whitfield's spouse.

6

suffered damage to their marital relationship. (ECF No. 1 ¶¶ 64-71). This court's subject-matter jurisdiction lies in diversity, 28 U.S.C. § 1332, as Plaintiffs are citizens of Virginia and Defendants are citizens of either Maryland or Utah and the amount in controversy exceeds $75,000. (*Id.* ¶ 4).

### C. Post-Complaint

Dr. David H. Goldstein, one of Plaintiffs' expert witnesses, was deposed. Dr. Goldstein testified that based on the symptoms Plaintiff presented upon arrival at SMH, Defendants should have promptly ordered a CAT Scan, and failure to do so promptly violated their standard of care. The CAT Scan would have revealed Plaintiff's SMVT, for which the standard of care was treatment with an anticoagulant such as the drug heparin. Dr. Goldstein contends that Defendants' failure to administer heparin by September 30, 2008 caused Plaintiff's injuries, because if the drug was administered by that date, it was his opinion that it is more likely than not that blood would have returned to her intestines, foregoing the need for surgery which resulted in the removal of seventeen inches of Plaintiff's small intestine. Alternatively, prompt administration of heparin would have reduced the amount of intestine that had to be removed.

## II.  Procedural Background

On June 7, 2013, Defendant Weatherby Locums, Inc. filed a motion for summary judgment, arguing that it is not liable for Dr. Hill's alleged negligence because Dr. Hill is not its employee, but instead an independent contractor.  Additionally, Weatherby Locums argues that Plaintiffs have not demonstrated that Plaintiffs relied upon Weatherby's apparent authority over Dr. Hill when receiving medical care.  (ECF No. 44).  Plaintiffs filed an opposition on June 24, 2013 (ECF No. 47), to which Weatherby replied on July 9, 2013 (ECF No. 48).

On July 19, 2013, Defendants filed a joint motion *in limine* to strike and exclude Dr. Goldstein's causation testimony on the ground that it fails to satisfy the requirements for admissibility of expert testimony pursuant to *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), and its progeny.  (ECF No. 49).  On the same day, Defendants filed a joint motion for summary judgment, arguing that because Dr. Goldstein was Plaintiffs' only expert who testified about causation, should his testimony be excluded, Defendants will have demonstrated that no genuine issue of material fact exists as to the causation element of Plaintiff's *prima facie* claim of negligence.  (ECF No. 50).  Plaintiffs filed oppositions to each motion on August 8, 2013 (ECF Nos. 49 & 50), and Defendants replied to both on August 26, 2013 (ECF Nos. 57 & 58).

Finally, on August 16, 2013, Defendants filed a motion to withdraw certain exhibits to their motion *in limine* and motion for summary judgment after being alerted by Plaintiffs that they contain personal identifying information. They propose to replace these exhibits with redacted versions. (ECF No. 56). Plaintiffs have not filed a response.

## III. Motion to Exclude

### A.   Standard of Review

Under Federal Rule of Evidence 702, the district court has "a special obligation . . . to 'ensure that any and all scientific testimony . . . is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (*quoting Daubert*, 509 U.S. at 589). Rule 702 provides,

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The United States Court of Appeals for the Fourth Circuit explained Rule 702 as follows:

> The first prong of this inquiry necessitates an examination of whether the reasoning or methodology underlying the expert's

> proffered opinion is reliable – that is,
> whether it is supported by adequate
> validation to render it trustworthy. *See*
> [*Daubert*, 509 U.S.] at 590 n.9. The second
> prong of the inquiry requires an analysis of
> whether the opinion is relevant to the facts
> at issue. *See id.* at 591-92.

*Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 260 (4th Cir. 1999).

To be considered reliable, an expert opinion "must be based on scientific, technical, or other specialized knowledge and not on belief or speculation, and inferences must be derived using scientific or other valid methods." *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (*citing Daubert*, 509 U.S. at 592-93). The district court enjoys "broad latitude" in determining the reliability and admissibility of expert testimony, and its determination receives considerable deference. *Kumho Tire Co.*, 526 U.S. at 142 (*citing Gen. Elec. Co v. Joiner*, 522 U.S. 136, 143 (1997)). The proponent of the testimony must establish its admissibility by a preponderance of proof. *Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 199 (4th Cir. 2001) (*citing Daubert*, 509 U.S. at 592 n.10).

## B. Analysis

### 1. Methodology

In his deposition, Dr. Goldstein provided his opinion "to a reasonable degree of medical certainty, that had the SMVT been diagnosed earlier that the outcome would have been different."

(ECF No. 49-6 at 15, Trans. 51:19-23). Dr. Goldstein believes that when Plaintiff arrived at SMH on September 28, 2008, she was already suffering from SMVT, which by definition means her bowel was ischemic, *i.e.*, having a decreased blood supply due to an obstruction. He believed that the ischemia explained why Ms. Whitfield was experiencing hematemesis, *i.e.*, blood in one's vomit. (*Id.* at 20-21, Trans. 73:14 – 75:10). Goldstein testified that, although Ms. Whitefield's bowel was ischemic, none of it upon arrival at SMH had yet become infarcted, or dead (necrosis), because of an obstruction of the blood supply. Dr. Goldstein draws this conclusion by way of a negative inference: an infarcted bowel results in a breakdown of the intestine's walls. This results in bacteria entering into the bloodstream which causes a person often to go into septic shock and die within twenty-four hours. The fact that Ms. Whitfield had survived for the four days she was in the care of SMH before the SMVT diagnosis leads to the conclusion that it was not infarcted upon admission or else she should have been dead. This conclusion was bolstered by Dr. Abassi's note on September 29, 2008, where he wrote that Plaintiff's abdomen had no rebound tenderness or guarding, meaning an absence of signs of acute peritonitis (inflammation of the thin tissue that covers most of the abdominal organs), suggesting that the bowel had not completely died. Therefore, Dr. Goldstein's medical opinion was

that Plaintiff's bowel was ischemic but not yet infarcted through September 30, 2008. (*Id.* at 15-16, Trans. 50:13 – 55:19). Dr. Goldstein goes on to explain that if the Defendants had followed the standard of care, they would have recognized that Plaintiff's arrival at SMH with a high heart and respiratory rate and abdominal pain meant by definition she had Systemic Inflammatory Response Syndrome ("SIRS") which can include multiple possible emergencies, including SMVT. These possibilities require evaluation by a CAT Scan which would have revealed SMVT. The CAT Scan was not done on September 29, 2008, when Plaintiff's condition should have demanded it, but instead October 2, 2008. By that time, the bowel had become infarcted which necessitated surgery. (*Id.* at 13-15, Trans. 44:2 – 50:12).

The crux of Defendants' motion concerns the next step in Dr. Goldstein's assessment. Dr. Goldstein posits that if the CAT Scan was done promptly – as demanded by the standard of care – the SMVT would have been discovered at a point where Plaintiff's bowel was only ischemic. The standard of care for an ischemic bowel is immediate treatment with an anticoagulant such as heparin. Dr. Goldstein contends that had Ms. Whitfield been treated with heparin by September 30, 2008, it is "more likely than not [that] she would not have required surgery. . . . Had she required surgery, it would have been done in a more

timely manner and less bowel would have been required to be resected." (*Id.* at 16, Trans. 56:12 – 57:11; *see also id.* at 32, Trans. 118:2-25 (same)). Defendants' attorney asked for Dr. Goldstein's reasoning behind his opinion that failure to diagnose Plaintiff's SMVT promptly and administer heparin resulted in her requiring surgery. Dr. Goldstein responded that he was relying on two issues:

> Number one, the main treatment indicated for the acute treatment of [SMVT] is heparin. That's the immediate emergency treatment that is recommended in all the publications that I've read and what I remember from my evaluation.
>
> Number two, that when the patient does not have signs of peritonitis – in other words, acute rebound and severe pain with rebound and guarding and a silent abdomen, in other words, a rigid abdomen – that the literature says that the only indication for surgery is when you actually have developed a peritonitis or severe ischemia.
>
> When you look at the record, the patient didn't have rebound on the 28[th], 29th, or 30th, and as I mentioned, if the patient actually had dead bowel on the 28[th], 29th, or 30th, it's my opinion she would have been dead if she didn't have surgery until the 3rd. So that's the basis of my opinion.

(*Id.* at 32, Trans. 119:5-23). Defendants' attorney continued to press Dr. Goldstein on his opinion that administration of heparin would have prevented Plaintiff's surgery.

> Q: Doctor, is it your opinion that any time a patient has ischemia with an SMVT but no peritonitis, that simply starting heparin

therapy can prevent the patient from going on to infarction?

A: When you say is it my opinion that it can simply do that, no.  It's my opinion that that's the standard of care, and that in many instances since it's the standard of care and that's the first treatment for it, it prevents bowel surgery.

And it's my opinion in this case that since she had three or four days before she got into more trouble that she had not yet infarcted the bowel.  So I'm just saying more likely than not, had the heparin been started on the 28th, 29th, and 30th, she would not have required surgery, and if she did require surgery, it would have been less bowel resection.

                    .  .  .

Q: So can we agree that even if a patient who has an SMVT causing ischemia receives heparin therapy, even with the heparin therapy, it is possible for that patient to go to infarct the bowel, correct?

A: Yes. Yes.

Q: Do you know what the statistics are, if any, on patients who simply have ischemia but not peritonitis in the face of an SMVT who get heparin therapy who don't go on to infarct some portion of their bowel?

A: I don't know the statistics.  All I know is as I mentioned in the articles that I've presented, the treatment of choice – the first treatment is anticoagulation, and if there's no peritonitis, many patients do not require bowel surgery at all, and she was not given that chance.  I don't know the statistics.

                    .  .  .

Q: Have you seen those statistics offered anywhere in the literature?

A: Well, I have not done a specific search for that. I'm not saying that those are or are not offered, but I did not do that search.

Q: Conversely, do you know what the statistics are for patients who have an SMVT, no peritonitis, but ischemia of the bowel who receive heparin therapy, but still go on to have – or require surgery and removal of portions of their bowel?

A: Well, that's the inverse of the first question, so by not answering the first, I don't have an answer for the second either.

(*Id.* at 32-33, Trans. 120:7-22, 121:9 – 122:1, 122:6 – 122:18).

In support of his opinion, Dr. Goldstein brought to the deposition the medical literature he relied upon. These articles indicate that

> [s]tandard initial treatment for acute mesenteric venous thrombosis includes heparin anticoagulation and resection of the infarcted bowel. Anticoagulation with heparin can be given even in patients who have gastrointestinal bleeding if the bleeding risk is considered to be outweighed by the risk of intestinal infarction. Patients who have good mesenteric blood flow demonstrated by angiography and who do not have peritoneal signs can be observed closely while other patients should proceed directly to laparotomy.

(*Id.* at 118, David A. Tendler & J. Thomas LaMont, *Acute Mesenteric Ischemia* (last updated May 4, 2012); *see also id.* at 122, Chat V. Dang, *Acute Mesenteric Ischemia Treatment & Management* (last updated Feb. 22, 2013) ("Heparin

anticoagulation is the main treatment of MVT. If no signs of bowel necrosis exist, the patient may not even need an operation.")).

Defendants attack Dr. Goldstein's view that administration of heparin would break up an already existing clot, thereby allowing blood to return to the bowel, staving off infarction and surgery. They argue that "[i]t has been established through scientific literature and testing that the medication [h]eparin does not break up, lyse, or destroy [an] existing clot in the body," but instead "only works to prevent future clots or the propagation of an existing clot in the body." (ECF No. 49-2, at 13-14). In support, Defendants provide the entry for "heparin" in the 2003 Physician's Desk Reference (the latest version before Ms. Whitfield's illness), which states that "[h]eparin does not have fibrinolytic activity; therefore, it will not lyse existing clots." (ECF No. 49-12, at 2). Defendants also provided affidavits of Dr. John Feigert, a hematologist, and Dr. Nancy Clark, a vascular surgeon. (ECF Nos. 49-13 & 49-14). Dr. Feigert avers that the hematemesis Plaintiff presented upon arrival at SMH "was evidence that the [SMVT] was already formed and had occluded the superior mesenteric vein." (ECF No. 49-13 ¶ 16). He disagreed with Dr. Goldstein's causation opinion "because it is not consistent with the medical science surrounding the mechanism of action of [h]eparin or how a [SMVT]

causes bowel injury leading to surgery." (*Id.* ¶ 17). By the time Plaintiff arrived at SMH, she already had the clot. Administering heparin would do nothing to bring blood flow back to the bowel because heparin simply does not have the capability to break down clots. Dr. Feigert believed that Plaintiff would have had to have surgery regardless of when Defendants diagnosed SMVT and there is no "reasonable medical or scientific support for Dr. Goldstein's contention" about the salutary effects of heparin. (*Id.* ¶¶ 19-22). Dr. Clark provided identical reasoning and conclusions. (*See* ECF No. 49-14 ¶¶ 12-13).

In response, Plaintiffs contend that even if heparin is unable to dissolve clots, it does not follow that administering heparin to Ms. Whitfield earlier would not have limited her injury because heparin does prevent propagation of existing clots. By not treating the clot, it was permitted to propagate, exacerbating ischemia which eventually led to infarction and removal of part of the bowel. (ECF No. 54 at 15-16). Plaintiffs provide additional literature in support of their position. (*See, e.g.*, ECF No. 54-14, at 5, Shaji Kumar, et al., *Mesenteric Venous Thrombosis*, 345 New Eng. J. Med. 1683, 1687 (Dec. 6, 2001) ("Mesenteric venous thrombosis can safely be managed without surgery if there is no evidence of bowel infarction.")). Defendants reply that Ms. Whitfield's presentation of hematemesis upon arrival at SMH demonstrated

that her ischemia was too severe to be reversed by heparin before the bowel would become infarcted and require surgery. (ECF No. 58, at 9-11).

The Fourth Circuit has recognized the competing principles at work in terms of expert testimony:

> On the one hand, the court should be mindful that Rule 702 was intended to liberalize the introduction of relevant expert evidence. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1158-59 (4th Cir. 1996). And, the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct. *See id.* As with all other admissible evidence, expert testimony is subject to being tested by "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Daubert*, 509 U.S. at 596. On the other hand, the court must recognize that due to the difficulty of evaluating their testimony, expert witnesses have the potential to "be both powerful and quite misleading." *Id.* at 595 (internal quotation marks omitted). And, given the potential persuasiveness of expert testimony, proffered evidence that has a greater potential to mislead than to enlighten should be excluded. *See United States v. Dorsey*, 45 F.3d 809, 815-16 (4th Cir. 1995).

*Westberry*, 178 F.3d at 261. A literature review can be an appropriate part of a method of determining causation. "Under the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi v. McNeil-P.P.C., Inc.*, 66 F.3d

1378, 1384 (4th Cir. 1995).  While this case is about medical malpractice, on the specific issue of causation, it turns into a drug efficacy case, specifically the efficacy of heparin if it was administered to Ms. Whitfield by September 30, 2008.  Even assuming, for the sake of this motion, that there was a breach in the standard of care, Plaintiffs still must demonstrate that eliminating Defendants' delay in administering heparin would have made it more likely than not that surgery would not have occurred.

Dr. Goldstein's testimony has met the standard of Rule 702 for reliability.  The studies Dr. Goldstein brought to his deposition representing what he relied upon in forming his conclusion support the opinions he expressed.  Critically, Dr. Goldstein points to Dr. Abassi's note on September 29, 2008 indicating that Plaintiff's abdomen had no rebound tenderness or guarding, meaning an absence of signs of peritonitis, suggesting that the bowel necrosis had not yet occurred.  Dr. Goldstein produced a medical article at deposition that supports the view that for pre-bowel necrosis, administering heparin can avoid surgery.  (*See* ECF No. 49-6, at 122, Chat V. Dang, *Acute Mesenteric Ischemia Treatment & Management* (last updated Feb. 22, 2013) ("Heparin anticoagulation is the main treatment of [mesenteric vein thrombosis].  If no signs of bowel necrosis exists, the patient may not even need an operation.").  Further

articles accompanying Plaintiffs' opposition support this position. (*See* ECF No. 54-14, at 5, Shaji Kumar, et al., *Mesenteric Venous Thrombosis*, 345 New Eng. J. Med. 1683, 1687 (Dec. 6, 2001) ("Mesenteric venous thrombosis can safely be managed without surgery if there is no evidence of bowel infarction."); ECF No. 54-15, at 5, Elena M. Stoffel & Norton J. Greenberger, *Mesenteric Ischemia*, at 68 ("[I]n patients with clinical and radiologic evidence of MVT, but no infarction, and with good mesenteric blood flow demonstrated by angiography, conservative management can be attempted using anticoagulation therapy.")). These studies indicate that Dr. Goldstein's opinion possesses the degree of reliability demanded by Rule 702 to be *admissible*, drawing no conclusions as to the *weight* to be attached to those opinions and their underlying evidence.

Defendants attempt to refute Dr. Goldstein's conclusions by pointing to the known properties of heparin, specifically its ability to prevent only the propagation of clots, not to lyse existing clots. They provide an affidavit of Dr. Feigert, a hematologist, who contends that upon presentation to SMH, Ms. Whitfield's condition already had passed the point where the body's natural ability to break up clots would work fast enough to prevent infarction and surgery even if heparin was administered to arrest the clot's propagation. (ECF No. 49-13 ¶ 21). Defendants will have ample opportunity to cross-examine

Dr. Goldstein about these arguments and present their own evidence, but for purposes of Rule 702, "the court need not determine that the expert testimony a litigant seeks to offer into evidence is irrefutable or certainly correct." *Westberry*, 178 F.3d at 261.

Defendants place great weight on *Doe v. Ortho-Clinical Diagnostics, Inc.*, 440 F.Supp.2d 465 (M.D.N.C. 2006), in which plaintiffs desired to have an expert testify that exposure to a drug caused their child's autism. As Defendants acknowledge, this case is not binding authority on this court. Furthermore, there are numerous differences between that case and the present situation. First, in *Doe* "all of the available peer-reviewed and generally accepted epidemiological studies refute causation." *Id.* at 475. Here, there is medical literature suggesting the opposite. Second, the *Doe* court rejected plaintiffs' expert because he could not meet the preponderance of the evidence standard required to show that the drug could cause autism because the principal study he relied upon stated that it only demonstrated "one *possible* mechanism by which [exposure to the drug] *could* increase the risk of autism." *Id.* at 474 (emphasis added). The court found such a conditional statement inadequate, characterizing it as mere "hypothesis and speculation." *Id.*

This standard is too exacting as it appears to be demanding that the expert's ultimate conclusion – exposure to the drug causes autism – be more likely than not, rather than demanding merely that plaintiff demonstrate by a preponderance of proof that their expert's methods and principles used to arrive at his conclusion are reliable and relevant. *See United States v. Moreland*, 437 F.3d 424, 431 (4th Cir. 2006).[5] While the Supreme Court of the United States has said that "conclusions and methodology are not entirely distinct from one another," *Gen. Elec. v. Joiner*, 522 U.S. 136, 146 (1997), this is not a case where "there is simply too great an analytical gap between the data and the opinion proffered," *id.* at 146; *cf. Gross v. King*

---

[5] Defendants make a similar argument elsewhere in the brief, setting forth the following standard for "preponderance": "Under this standard, the proponent 'must present reliable, probative, and substantial evidence of such sufficient quality and quantity that a reasonable [judge] could conclude that the existence of the facts supporting the claim are more probable than their nonexistence.'" (ECF No. 49-2, at 11 (*quoting United States Steel Mining Co., Inc. v. Dir., Office of Workers' Comp. Programs, United States Dep't of Labor*, 187 F.3d 384, 389 (4th Cir. 1999)). But *Steel Mining* was concerned with the burden of a proponent to prove each element of his ultimate claim, as opposed to the preliminary matter of whether evidence to support that claim is admissible pursuant to the Federal Rules of Evidence. In arriving at the preponderance standard for Rule 702 admissibility, the Supreme Court in *Daubert* cited *Bourjaily v. United States*. 509 U.S. at 592 n.10. *Bourjaily* explained that "[t]he inquiry made by a court concerned with these matters is not whether the proponent of the evidence wins or loses his case on the merits, but whether the evidentiary Rules have been satisfied. Thus, the evidentiary standard is unrelated to the burden of proof on the substantive issues, be it a criminal case or a civil case." 483 U.S. 171, 175 (1987) (citations omitted).

*David Bistro*, 83 F.Supp.2d 597, 600 (D.Md. 2000) (finding too great a gap between data and proffered opinion where data could only support opinion by analogy and was, furthermore, "too nascent and tepid" to support its original conclusion). Further, the *Doe* court cited *Cavallo v. Star Enter.*, 100 F.3d 1150 (4th Cir. 1996), in support of its rejection of the expert's conclusion. But in *Cavallo*, the Fourth Circuit, while upholding the district court's exclusion of expert testimony as not inconsistent with *Daubert*, remarked that the district court's standard was "restrictive." *Id.* at 1159. Such a restrictive view of Rule 702 will not be followed here, given Rule 702's liberal language and Defendants' further opportunities to challenge and refute Dr. Goldstein opinions. *See Westberry*, 178 F.3d at 261; Fed. R. Evid. 702 advisory committee notes, 2000 amendments ("A review of the caselaw after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.").

Having reviewed Dr. Goldstein's testimony and the literature he relies upon, it cannot be said that his methodology or ultimate conclusions are unwarranted, at least for the purposes of admissibility. This is not to say that Dr. Goldstein's methodology and conclusions are impervious to criticism. Indeed, many of his methods may be tested by Defendants on cross-examination. At this juncture, however,

only the admissibility of Dr. Goldstein's opinion is at issue, not the weight it should be afforded, and his opinion passes that threshold.

## 2.   Qualifications

Defendants also challenge Dr. Goldstein's qualifications to provide expert testimony on causation.   Dr. Goldstein received his medical degree from the University of Manitoba in 1976 and performed his internship, residencies, and fellowships at Harvard Medical School.   He is currently a pulmonologist and hospitalist at a hospital in Sarasota, Florida and is also a clinical professor of internal medicine, pulmonary medicine, and hospitalist medicine at Florida State University Medical School. He is board certified in pulmonology and internal medicine. (ECF No. 54-13, *curriculum vitae* of David H. Goldstein, M.D.). Dr. Goldstein has only diagnosed two cases of SMVT in his career and never testified as an expert in an SMVT litigation, nor has he published anything on SMVT.   (ECF No. 49-6 at 7, 12, Trans. 18:2-25, 38:15-25).   But Dr. Goldstein as a hospitalist would be the first doctor responsible for diagnosing SMVT and starting the patient on heparin.   (*Id.* at 18, Trans. 65:1-20).   He would be responsible for monitoring heparin and evaluating its effectiveness in a given patient.   (*Id.* at 19, Trans. 66:11 – 67:4).   Defendants argue that Dr. Goldstein is not qualified to give testimony on causation because he lacks experience in

general or vascular surgery and therefore is not qualified to render an opinion on the necessity of surgery if heparin was administered earlier. (ECF No. 49-2, at 22-23).

The Fourth Circuit has held that "[t]he witness' qualifications to render an expert opinion are . . . liberally judged by Rule 702. *Kopf v. Skyrm*, 993 F.2d 374, 377 (4th Cir. 1993). "Inasmuch as [Rule 702] uses the disjunctive, a person may qualify to render expert testimony in any one of the five ways listed: knowledge, skill, experience, training, or education." *Id.*

> Generally, the test for exclusion is a strict one, and the purported expert must have neither satisfactory knowledge, skill, experience, training nor education on the issue for which the opinion is proffered. One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion.

*Kline*, 878 F.2d at 799. Moreover, a "lack of direct experience is not a sufficient basis to reject [a proposed expert's] testimony, but may affect the weight that testimony is given, a decision properly made by the [finder of fact]." *Martin v. Fleissner GMBH,* 741 F.2d 61, 64 (4th Cir. 1984).

Dr. Goldstein's experience with diagnosing SMVT and administering heparin and monitoring its effects, combined with his knowledge from reviewing the literature discussed above, qualify him as an expert on causation. He can assist the trier

25

of fact with the issue of how diagnosing SMVT at an earlier time – with the corresponding administration of heparin – would have affected Plaintiff's injuries. Defendants' issues with Dr. Goldstein's experience or knowledge can similarly be challenged on cross-examination. Therefore, Defendants' motion to exclude Dr. Goldstein's testimony on causation will be denied.

## IV. Motions for Summary Judgment

### A. Standard of Review

A motion for summary judgment will be granted only if there exists no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986). The moving party bears the burden of showing that there is no genuine dispute as to any material fact.

### B. Analysis: Defendants' Joint Motion

Plaintiffs' claims are for medical malpractice, "which includes the elements of duty, breach, causation, and harm." *Barnes v. Greater Balt. Med. Ctr.*, 210 Md.App. 457, 480 (2013). To prove causation, Plaintiffs have "to establish that but for the negligence of the [Defendants], the injury would not have occurred. Because of the complex nature of medical malpractice cases, expert testimony is normally required to establish breach of the standard of care and causation." *Id.* at 481 (internal

citations omitted). Defendants' motion for summary judgment is premised entirely on the court granting their motion to exclude Dr. Goldstein's expert testimony on causation. Defendants argue that Dr. Goldstein is the only expert who testified as to causation, so if Dr. Goldstein's causation testimony is excluded, Plaintiffs will have failed to satisfy that element of their *prima facie* case. (*See generally* ECF No. 50). Because their motion to exclude will be denied, so too will their motion for summary judgment.

### C. Analysis: Motion of Weatherby Locums, Inc.

Plaintiffs argue that Defendant Weatherby Locums, Inc. is liable for the negligence of Defendant Hill as her employer under the doctrine of *respondeat superior*. Weatherby Locums moved for summary judgment, arguing that Dr. Hill is not its employee, but merely an independent contractor. Additionally, Weatherby Locums argues that Plaintiffs have not demonstrated any genuine issue of material fact that Weatherby Locums had apparent authority over Dr. Hill.

### 1. Actual Authority

Generally speaking, a principal is vicariously liable for the negligence of another when the two share a master-servant or employer-employee relationship, but not if the other is merely an independent contractor of the principal. *Hunt v. Mercy Med. Ctr.*, 121 Md.App. 516, 545 (1998). The distinction between a

servant and an independent contractor lies in the degree of control exerted by the employer. *Danner v. Int'l Freight Sys. Of Washington, LLC*, 855 F.Supp.2d 433, 454-55 (D.Md. 2012) (applying Maryland law). In *Balt. Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 387 (2001), the Court of Appeals of Maryland said: "[T]he test in determining whether a person is a servant or an independent contractor is whether the employer has the right of control over the employee in respect to the work to be performed." (citation omitted). A "servant is a person who is employed to perform . . . services for another . . . and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control." *Green v. H & R Block, Inc.*, 355 Md. 488, 508-09 (1999) (*quoting Globe Indemnity Co. v. Victill Corp.*, 208 Md. 573, 581 (1956) (quotation marks omitted)). Conversely, an independent contractor is generally "free to exercise his own judgment and discretion as to the means and assistants that he may think proper to employ about the work, exclusive of the control and direction, in this respect, of the party for who the work is being done." *Balt. Harbor Charters*, 365 Md. at 387 n.15 (citation and quotation marks omitted). Notably, "[t]he reservation of some control over the manner in which work is done does not destroy the independent contractor relationship where the contractor is not deprived of his judgment in the

execution of his duties." *Brooks v. Euclid Sys. Corp.*, 151 Md.App. 487, 510 (2003).

Weatherby Locums argues that Dr. Hill was an independent contractor. Weatherby Locums and Dr. Hill entered into a "Physician Professional Services Agreement" which explained that "Weatherby desires to engage [Dr. Hill] on an independent contractor basis to furnish *locum tenens* physician services to Weatherby clients. [Dr. Hill] desires to provide independent contractor *locum tenens* physician services through Weatherby to clients." (ECF No. 44-2, at 1). In support of its position, Weatherby points to two clauses of its contract with Dr. Hill. Sections 1.5 and 1.6 obligate Dr. Hill to "faithfully and diligently render Services pursuant to the highest professional and ethical standards and in accordance with accepted standards of care," and provide that she "shall exercise independent judgment and control over the provision of Services." This, according to Weatherby Locums, demonstrates that it retained no control over Dr. Hill's independent medical decisions and thus Dr. Hill is an independent contractor. This view is confirmed by Section 1.12 which states that "Weatherby Locums's interest is in the final result of arranging for medical coverage and not in making specific medical decisions. As an independent contractor, [Dr. Hill] is not an employee of Weatherby or [SMH] for any purpose." In addition, Weatherby's service agreement

with SMH states that "[e]ach Physician is an independent contractor of Weatherby. . . . Weatherby's interest is in furnishing Physician coverage; Weatherby does not make clinical decisions for Physicians and does not otherwise direct or control the clinical services furnished by Physicians." (ECF No. 44-5, § 2.B). Weatherby maintained this position in its answers to Plaintiffs' interrogatories. (*See* ECF No. 44-4).

Plaintiffs counter that the agreement between Weatherby Locums and Dr. Hill places numerous restrictions and requirements on Dr. Hill which "amount to an agent being subject to the principal's control over the result or ultimate objectives of the agency relationship." (ECF No. 47-1, at 7). Plaintiffs see section 1.6 in a very different light. Specifically, its clause requiring Dr. Hill to provide necessary clinical documentation to the hospital in a timely manner or be considered in a material breach constitutes much more than a mere reservation of control. Other sections indicate Weatherby Locums's control of Dr. Hill's work. Section 3.0 places a non-compete clause on Dr. Hill: during the term of the agreement and for twelve months thereafter, she is not to provide services to client hospitals unless through Weatherby Locums or directly compete with client hospitals' practices. Section 4.1e provides Weatherby the right to cancel the agreement immediately if it is Weatherby Locums's reasonable determination that Dr. Hill has

failed to perform her physician duties "in accordance with the highest professional and ethical standards," a standard higher than the standard imposed by law. Section 5.1 gives Weatherby Locums permission to use Dr. Hill's name as a reference in the normal course of business, and Section 5.4 provides that all data received from Dr. Hill or on Dr. Hill's behalf in connection with the agreement is the property of Weatherby Locums. Finally, Section 5.E of the Weatherby-SMH agreement explains that should SMH desire to remove Dr. Hill for professional incompetence, Weatherby Locums "reserves the right to first counsel [Dr. Hill] and provide an opportunity for [Dr. Hill] to correct any deficiencies prior to any such removal if, in its reasonable discretion, there is no risk of patient endangerment." Plaintiffs contend that this clause indicates that even if SMH wanted to fire Dr. Hill, it could not do so because Weatherby Locums held ultimate control over Dr. Hill.

In its reply, Weatherby Locums dismisses most of Plaintiffs' contentions as not relevant to whether Weatherby Locums actually controlled Dr. Hill as an employer controls its employee. Weatherby Locums argues that, regardless, a principal having some control over how the work is done does not destroy the independent contractor relationship where the contractor maintains judgment in the execution of his duties, citing *Brooks*. Section 1.2 of the agreement between Weatherby Locums

and Dr. Hill left Dr. Hill with a large degree of autonomy, allowing her to refuse any assignment. This fact was confirmed in Dr. Hill's deposition, where she also stated that Weatherby Locums did not control her hours in any way. (ECF No. 44-3 at 3, Trans. 16:9-21). Furthermore, Section 4.3 provides that either party could terminate any assignment or the entire agreement with thirty days notice.

The contractual relationship between Dr. Hill and Weatherby Locums permitted Dr. Hill to practice medicine with complete autonomy. Many aspects of the contract Plaintiffs cite are peripheral issues that do not go to the ultimate question of whether Dr. Hill retains control over the manner by which she performs her duties, namely the practice of medicine. Such control exerted by Weatherby Locums does not convert an independent contractor relationship into one of employer-employee. While the Maryland Court of Appeals has held that "[t]he existence of an agency relationship is a question of fact which must be submitted to the factfinder if any legally sufficient evidence tending to prove the agency is offered," *Faya v. Almaraz*, 329 Md. 435, 460 (1993), no such evidence has been provided by Plaintiffs. *Cf. Lopez-Krist v. Salvagno*, No. ELH-12-01116, 2013 WL 5705437, at *13 (D.Md. Oct. 17, 2013) (summary judgment for medical center improper where contract between doctor and medical center gave doctor control over most

medical decisions, medical center retained ability to control schedule to some extent and to overrule his decisions in particular circumstances). Accordingly, Weatherby's motion for summary judgment will be granted on the issue of actual authority.

### 2. Apparent Authority

Maryland has adopted the Restatement (Second) of Agency, § 267 (1958) in determining the existence of an apparent agency relationship, which states:

> One who represents that another is his servant or other agent and thereby causes a third person justifiably to rely upon the care of skill of such apparent agent is subject to liability to the third person for harm caused by the lack of care of skill of the one appearing to be a servant or other agent as if he were such.

*See Mehlman v. Powell*, 281 Md. 269, 273 (1977). The Maryland Court of Appeals has explained that the doctrine contains two tests:

> The first [test] is objective: could a reasonable man believe that the company's manifestations of apparent authority indicate it is holding the operator out as its agent? The second is subjective: did the facts known by the plaintiff in a particular case reasonably justify his assumption that the operator was the company's agent?

*Chevron, U.S.A., Inc. v. Lesch*, 319 Md. 25, 35 (1990) (citation omitted). In order to recover on this theory, in addition to

showing that Dr. Hill was negligent and her negligence was a proximate cause of Plaintiffs' injuries, Plaintiffs must show that: (1) they were misled by Weatherby Locums into believing that Dr. Hill was an employee of Weatherby Locums; (2) this belief was objectively reasonable under all the circumstances; and, (3) they relied on the existence of that relationship in making their decision to entrust Dr. Hill with Ms. Whitfield's care. *Id.* at 34-35. In regard to the third requirement, "[t]he mere fact that acts are done by one whom the injured party believes to be the defendant's servant is not sufficient to cause the apparent master to be liable. There must be such reliance upon the manifestation as exposes the plaintiff to the negligent conduct." *Id.* at 35 (*quoting* Restatement (Second) of Agency, § 267 cmt. A (1958)).

Plaintiffs bear the burden to show that appearances created by Weatherby Locums led them to believe that Dr. Hill was an agent of Weatherby Locums. *JAI Med. Sys. Managed Care Org., Inc. v. Bradford*, 209 Md.App. 68, 78 (2012). Plaintiffs make no such attempt, instead relying exclusively on the apparent "special relationship" between hospital and physician established in *Mehlman*. In *Mehlman*, the plaintiff went to a hospital's emergency room for care. Plaintiff had no knowledge that the emergency department was not operated by the hospital, but rather by an independent contractor. A physician who was an

34

employee of the contractor was negligent in his care for plaintiff. Plaintiff sued the hospital, but the hospital argued that it could not be held vicariously liable for the actions of an independent contractor. The Court of Appeals rejected this argument:

> [A] [h]ospital . . . is engaged in the business of providing health care services. One enters the hospital for no other reason. When [the plaintiff] made the decision to go to [the hospital], he obviously desired medical services and equally obviously was relying on [the hospital] to provide them. Furthermore, the [h]ospital and the emergency room are located in the same general structure. . . . It is not to be expected, and nothing put [the plaintiff] on notice, that the various procedures and departments of a complex, modern hospital . . . are in fact franchised out to various independent contractors.

281 Md. at 274.

Unlike the hospital in *Mehlman* though, Weatherby Locums is one step further removed from physician-patient relationship, for not only is Dr. Hill not its actual employee, but it made no representations to Plaintiffs to lead them to believe that Dr. Hill was apparently its employee. Southern Maryland Hospital was the entity presenting itself to the community as available to provide care. Weatherby Locums was nowhere to be found.

Plaintiffs address this inconvenient fact by arguing that Weatherby Locums should be considered equivalent to SMH for the purposes of apparent authority because it and SMH have

established a "joint venture relationship." According to Plaintiffs, by entering into an agreement to furnish physicians for the time periods requested, Weatherby Locums and SMH became joint-partners, such that any representations SMH made to Plaintiffs were also made by Weatherby Locums.

Plaintiffs cite no case law to support such a proposition and none has been found. It does not follow that merely contracting with another for services establishes a joint partnership.[6] Weatherby Locums's motion for summary judgment will be granted on the issue of apparent liability. Therefore, Weatherby Locums's motion for summary judgment will be granted in full.

## V. Motion to Withdraw and Replace Certain Exhibits

Finally, Defendants filed a joint motion to withdraw certain exhibits to their joint motion *in limine* and their joint motion for summary judgment and replace those exhibits with

---

[6] Plaintiffs predict that such a ruling would "be advocating for hospitals to conceal the identity of all of their physicians so as to escape all liability. The Court cannot allow a party to contract away its liability." (ECF No. 47-1, at 13). This ruling does no such thing. Hospitals that decide to use this ruling as inspiration to contract out all of their services are still potentially liable under the doctrine of apparent authority. Furthermore, those companies the hospital has contracted with could also be liable if a plaintiff can demonstrate that - despite whatever arrangement the contractor may have entered into – the contractor controls their "independent contractors" to such an extent that they are properly considered their employees.

redacted versions.[7]  Defendants were alerted by Plaintiffs that those exhibits contain personal identifying information, such as Social Security Numbers and birthdates.  Pursuant to Federal Rule of Civil Procedure 5.2 and the October 10, 2012 Scheduling Order, such personal identifying information should have been redacted.  Defendants have submitted redacted versions to replace some of the offending documents.  Plaintiffs have not filed a response.

Exhibit 4 to the motion *in limine* was filed in four parts totaling nearly 200 pages.  The proposed redacted exhibit contains only 17 pages.  A cursory examination of the other portions of Exhibit 4 reveals instances of personal identifying information that was not marked for redaction.  (ECF No. 49-7, at 30 (full birthdate)).  Defendants submitted a "redacted" version of Dr. Olden's deposition transcript which was part of their motion *in limine* (Exhibit 11) and their motion for summary judgment (Exhibit 6).  Review of the proposed redacted version reveals nothing marked for redaction.  This is understandable, as no personally identifying information is apparent.  The motion will be granted and Defendants will be provided fourteen (14) days from the date of this Order to provide a redacted

_____

[7] Upon the filing of the motion, the exhibits were placed under seal.

version of the remaining portion of Exhibit 4 and to clarify why Dr. Olden's deposition transcript requires redaction.

## VI.  Conclusion

For the foregoing reasons, the motion for summary judgment filed by Defendant Weatherby Locums will be granted.  The motion for summary judgment filed jointly by Defendants will be denied. The motion to withdraw and replace documents filed jointly by Defendants will be granted.  A separate order will follow.


                          /s/
    _____
                          DEBORAH K. CHASANOW
                          United States District Judge